UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------x
CARLOS BURGOS,                     :
                                   :
          Plaintiff,               :
                                   :
v.                                 : Civil No. 3:09CV01320(AWT)
                                   :
CITY OF NEW BRITAIN,               :
WILLIAM GAGLIARDI, ANTHONY PAVENTI :
AND MATTHEW TUTTLE,                :
                                   :
          Defendants.              :
-----------------------------------X
```

### RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Carlos Burgos ("Burgos") brings, pursuant to 42 U.S.C. § 1983, claims against defendants City of New Britain (the "City"), William Gagliardi ("Gagliardi"), Anthony Paventi ("Paventi"), and Matthew Tuttle ("Tuttle"). Burgos brings against the individual defendants a First Amendment retaliation claim, a claim for interference with his right to familial association, and a substantive due process claim; he also brings a Monell claim against the City. In addition, Burgos brings against all defendants a common law claim for invasion of privacy. Burgos alleged a Ninth Amendment claim, which he has withdrawn, and he represents that he has not brought any procedural due process claim. The defendants have moved for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is being granted as to all the plaintiff's federal claims, and the court is declining to

-1-

exercise jurisdiction over the plaintiff's state law claim.

I.   **FACTUAL BACKGROUND**

Burgos is a Sergeant in the New Britain Police Department (the "NBPD"). At all relevant times, defendant Gagliardi was Chief of the NBPD, and defendant Paventi was a Lieutenant in the NBPD in charge of training and internal affairs. Defendant Tuttle, who is now deceased,[1] was a Captain in the NBPD assigned to the Detective Bureau.

In May 2008, three female NBPD officers, Jennifer Raspardo, Needasabrina Russell and Gina Spring, made complaints to the NBPD and to the Commission on Human Rights and Opportunities that they were being subjected to a hostile work environment because of their gender. The plaintiff states that he first became aware of these allegations of discrimination on or around May 5, 2008. The plaintiff states that at that time he made his outrage about the alleged discrimination known to fellow police officers Lieutenant Stanley Masternak and Sergeant Allan Raynis, by expressing support for Officers Raspardo, Russell and Spring. The plaintiff states that on or about November 18, 2008 he made it known to Union President John Gonzalez that he supported Officers Raspardo, Russell and Spring in their claims against the NBPD. Each of Gagliardi, Paventi and Tuttle has averred that he had no

---

[1] The Plaintiff was granted an extension of time until November 8, 2011 to file a motion to substitute party with respect to defendant Tuttle.

knowledge of any such statements by Burgos.  The plaintiff does not claim that he informed the individual defendants of his views and there is no evidence that any of them had any knowledge of the plaintiff's statements to Masternak or Raynis.

On April 9, 2008, almost a month prior to Burgos becoming aware of the complaints by Raspardo, Russell and Spring, defendant Paventi sent a memo to all supervisors informing them that they were required to attend two mandatory multi-day training courses.  This memo, sent at the direction of Gagliardi, stated:

> As each of you are aware, Chief W. Gagliardi has placed a strong emphasis on advancing the training of all supervisors in our police department.  Therefore, over the course of the next several months, each of you will be contacted by myself and/or Sergeant T. Marino to attend upcoming training in various supervisory courses.
>
> As of this time, training records indicate that you all have received basic training in Level-1 Police Supervision.  We are now into the next phase of training which will encompass more advanced courses for each of you in various supervisory programs provided by Roger Williams University Justice System Training And Research Institute.
>
> The Lieutenants will be selected to a attend ten (10) day Mid-Management training course and the Sergeants a five (5) day Advanced First Line Supervisor Course.
>
> Additionally, each of you will also be contacted to attend the five (5) day WMD Incident Command Capabilities, Planning and Response Actions (WMD/All Hazards) training program in Anniston [sic], Alabama.

> Each of these courses is MANDATORY and will
> require you to travel out of state with the
> understanding that accommodations will be made
> as best as possible to handle any reasonable
> family and/or child care issues that you may
> have. However, family and/or child care
> issues will not preclude you from your
> obligation to attend these training programs
> as the dates for the courses are minimal and
> fill rather quickly.

(Def.'s Motion for Summary Judgment (Doc. No. 28) ("Def.'s Motion"), Exh. 5). The Aniston training and other training was ordered to help bring the NBPD into compliance with Governor M. Jodi Rell's Executive Order No. 10.

On May 16, 2008, the defendant's union, Local 1165, AFSCME, Council 15, AFL-CIO, filed a municipal prohibited practice complaint with the State of Connecticut Board of Labor Relations in response to the April 8, 2008 memo, alleging that the City had violated the Municipal Employees Relations Act because mandatory out of state training had not been included in the negotiations with the union. This complaint was later withdrawn, in August 2009, "with the understanding that the City will not send any supervisor police employee to out-of-state training involuntarily except classes scheduled in Aniston, Alabama and at Roger Williams University in Rhode Island through the conclusion of the collective bargaining agreement which expires on June 30, 2010, and at which time the parties are free to negotiate over any training outside the State of Connecticut." (Def.'s Motion, Exh. 23).

In a conversation with Paventi on or around August 28, 2008 regarding attendance at the training course in Aniston, Alabama, Burgos was given dates in November and December 2008. At that time, Burgos chose the December 8-12, 2008 session, while reiterating earlier concerns he had expressed about child care and having to travel out of state for training.[2] These concerns were substantially the same as the concerns raised in the complaint that had been filed by his union.

Prior to attending the training course in Aniston, Alabama, all officers were required to fill out a medical information release, which allowed the release by the U.S. Department of Homeland Security ("DHS") of privileged medical information to the officer's private physician or healthcare provider, and a general release of liability in favor of DHS. (Def's Motion, Exh. 12). Burgos objected to signing these forms, but later did so in order to avoid a charge of insubordination. All officers were also required to complete a medical questionnaire,[3] which was to be sent to the DHS, at the time they signed the medical information and liability releases.

On or about December 6, 2008, after he had made several

---

[2] The defendants contend that the plaintiff raised concerns for the first time on November 18, 2008, but the court accepts the plaintiff's version of events for purposes of this motion.

[3] The defendants contend that the plaintiff was not required to fill out the questionnaire, but the court accepts the plaintiff's version of events for purposes of this motion.

attempts to negotiate with the NBPD modifications in the language of the liability release, Burgos was ordered to sign the medical information and liability releases without modification. On December 8, 2008, Burgos went to Aniston, Alabama for the training course, but on December 9, 2008 he informed the NBPD that he had a family medical emergency. Arrangements were made to have Burgos flown back to New Britain. The plaintiff was paid five hours of overtime for the 24 hour period he spent in Aniston.

**II. LEGAL STANDARD**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-

finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture"

is insufficient to defeat a motion for summary judgment.  Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant.  Anderson, 477 U.S. at 252.

## III.  DISCUSSION

The plaintiff claims that when the individual defendants forced him to sign medical information and liability releases and to attend a training course in Aniston, Alabama, they retaliated against him for exercising his right to free speech under the First Amendment, his right to familial association under the First and Fourteenth Amendments, and his right to substantive due process.  He also brings a Monell claim against the City, and a common law claim for invasion of privacy based on the medical questionnaire he was required to submit to DHS.

### A.  First Amendment Retaliation Claim

To prevail on a First Amendment retaliation claim, a public employee must establish that: "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action so that it can be said that

[plaintiff's] speech was a motivating factor in the determination." Gallagher v. Town of Fairfield, No. 3:10-cv-1270, 2011 WL 3563160, at *4 (D.Conn., Aug 15, 2011) (quoting Barclay v. Michalsky, 451 F.Supp.2d 386, 394 (D.Conn. 2006); and Mandell v. Cty. of Suffolk, 316 F.3d 368, 382 (2d Cir. 2003)).

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Sousa v. Roque,  578 F.3d 164, 173 (2d. Cir., 2009) (citing, Connick v. Meyers, 461 U.S. 138, 147-48) (1983)).  A matter of public concern is one that "relat[es] to any matter of political, social, or other concern to the community." Id. at 170.  "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" Id. at 173 (quoting Ruotolo v. City of New York, 514, F.3d 184, 189 (2d. Cir. 2008).

The plaintiff has produced evidence that would establish the first element of this claim.  He is a public employee, and speech addressing gender discrimination in the NBPD is speech addressing a matter of public concern.  However, the defendants have met their initial burden with respect to the second and third elements, and the plaintiff has failed to create a genuine issue of material fact as to either.

As to the second element, the Second Circuit has defined an "adverse employment action" as a "materially adverse change in the terms and conditions of employment." Sanders v. N.Y. City

-9-

Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).  Such "materially adverse" changes "include discharge, refusal to hire, refusal to promote, demotion, reduction in pay and reprimand." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).  "In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010).

> Thus, ... in order to prove a claim of First Amendment retaliation in a situation other than the classic examples of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand, plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.

Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002).  The plaintiff contends that he was retaliated against when he was required to attend the training course in Aniston, Alabama. However, all other supervisors were also required to attend. Also, being required to sign standard release forms that all other attendees were also required to sign does not create an unreasonably inferior work environment.

As to the third element, the plaintiff has failed to create a genuine issue of material fact as to a causal connection. Gagliardi's memorandum to all supervisors regarding the training course was distributed on April 9, 2008, and the plaintiff's

protected speech could not have occurred prior to May 5, 2008, when he first learned of the complaints by Raspardo, Russell, and Spring.

In addition, the plaintiff has not produced any evidence of an awareness on the part of any of the individual defendants that he spoke out. "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) (internal citations omitted). There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009). However, "the direct physical participation of the defendant in the constitutional violation is not alone a sufficient basis for holding the defendant liable if the defendant had no awareness or notice of the facts that rendered the action illegal." Provost v. City of Newburgh, 262 F.3d 146, 154-155 (2d. Cir. 2001). The plaintiff asserts that his outrage was widely known among his peers, thus resulting in retaliation by the individual defendants. Such a conclusory assertion is insufficient to create a genuine issue of material fact as to causation.

Therefore, the Defendant's motion is being granted as to the

First Amendment retaliation claim.

**B. Familial Association Claims**

"The Supreme Court has recognized a right of association with two distinct components-an individual's right to associate with others in intimate relationships and a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment, such as speech and other expressive conduct." Adler v. Pataki, 185 F.3d 35, 42 (2d Cir. 1999) (citing Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984)). Both the source of the intimate association right and the standard applied in determining whether that right has been violated have varied over time. In Adler, the Second Circuit explained that the source of the familial association right can be either the First Amendment or the Fourteenth Amendment:

> Language in Roberts suggests that this right is a component of the personal liberty protected by the Due Process Clause. See id. at 618-19. However, in City of Dallas v. Stanglin, 490 U.S. 19 (1989), the Court cited the First Amendment as "embrac[ing]" a right of association that included the two elements identified in Roberts, intimate association and expressive association. See Stanglin, 490 U.S. at 23-24. In FW/PBS, Inc. v. Dallas, 493 U.S. 215, 237 (1990), the Court considered a claimed violation of the "right to freedom of association recognized in Roberts" without indicating whether the right was grounded on the First Amendment or the Due Process Clause.

Adler, 185 F.3d at 42. Two standards have been articulated for

-12-

assessing whether the right has been violated:

> Sometimes court opinions suggest that an intimate association right is not violated unless the challenged action has the likely effect of ending the protected relationship[.] . . . In other cases, the opinions consider whether the challenged action alleged to burden an intimate association is arbitrary or an " 'undue intrusion' by the state into the marriage relationship." Adkins, 982 F.2d at 956 (quoting Roberts, 468 U.S. at 618, 104 S.Ct. 3244).

Adler, 185 F.3d at 42. Regardless of which standard applies, the plaintiff has failed to create a genuine issue of material fact. The plaintiff does not allege that any protected relationship has ended. With respect to an undue intrusion, the plaintiff's evidence is that he was forced to arrange for child care for a period of up to one week because of his wife's work schedule. Because he came home early, the plaintiff was actually in Alabama for 24 hours. Imposing on an employee a requirement that forces the employee to make arrangements for child care for a period of one week or less to accommodate his spouse's work schedule does not constitute an undue intrusion into the employee's familial relationship.

**C.   Substantive Due Process Claim**

For conduct to constitute a denial of substantive due process, it must be conduct which "can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience. . . and is so brutal and offensive that it does not comport with

traditional ideas of fair play and decency . . . ." Smith v. Half Hollow Hill Cent. Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002) (internal citations and quotation marks omitted).

> Substantive due process is an outer limit on the legitimacy of governmental actions.  It does not forbid governmental actions that might fairly be deemed arbitrary or capricious. . . .  Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.

Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999). "Only a substantial infringement of . . . law prompted by personal animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983." Id.  Conduct that is, "intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998).

The unconstitutional conduct the plaintiff contends the defendants engaged in is that they ordered him to attend the training course in Aniston, Alabama and to submit a medical information form and releases in connection with that training, where that training was required of all supervisors as part of an effort to help the NBPD comply with an executive order of the Governor and where all other supervisors were required to submit such a form and such releases.  In withdrawing its complaint, the plaintiff's union conceded that the City had authority to send

-14-

supervisors to the training course in Aniston, Alabama, merely reserving the right to make attendance at training programs outside Connecticut a matter for negotiation with respect to the next collective bargaining agreement.  Such conduct can not support a conclusion that there was a substantive due process violation.

Therefore, the motion for summary judgment is being granted as to the plaintiff's substantive due process claim.

**D.   Monell Claim**

"In [Monell v. Department of Social Services, 436 U.S. 658 (1978),] the Supreme Court ruled for the first time that municipalities were liable under § 1983 to be sued as 'persons' within the meaning of that statute, when the alleged unlawful action implemented or was executed pursuant to a governmental policy or custom." Reynolds v. Giuliani, 506 F.3d 183, 190 (2d Cir. 2007). "A municipality and its supervisory officials may not be held liable in a § 1983 action for the conduct of a lower-echelon employee solely on the basis of respondeat superior. . . . In order to establish the liability of such defendants in an action under § 1983 for unconstitutional acts by such employees, a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy." Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 122 (2d Cir. 1991) (citation omitted). Thus, "a plaintiff must

demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." Roe v. City of Waterbury, 542 F.3d 31, 36-37 (2d Cir. 2008) (citation omitted).

"Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether the official had final policymaking authority in the particular area involved." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir.2000). "The existence of such authority is a question of law." Id.

Also, the plaintiff must establish a causal link between the alleged policy or practice and the alleged constitutional violation. See City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("[The] first inquiry in any case alleging municipal liability under § 1983 is the question is whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").

The plaintiff contends that Gagliardi, as Chief of Police acting in his official capacity, was a decisionmaker responsible for setting policies and practices for the NBPD, and that Tuttle and Paventi acted at Gagliardi's direction. However, as discussed above, here the plaintiff has failed to create a genuine issue of

-16-

material fact as to whether any of his federally protected rights was violated.

Therefore, the defendant's motion is being granted as to the plaintiff's the <u>Monell</u> claim.

**E. Invasion of Privacy Claim**

Having granted summary judgment in favor of the defendants on all of the plaintiff's federal law claims, the court declines to exercise supplemental jurisdiction over his state-law claim. Under 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." When federal claims are dismissed before trial, the basis for retaining jurisdiction is weak. See <u>Valencia ex rel. Franco v. Lee</u>, 316 F.3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.") (quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n. 7 (1988)).

**IV. CONCLUSION**

For the reasons set forth above, Defendants City of New Britain, William Gagliardi, Anthony Paventi and Matthew Tuttle's

Motion for Summary Judgment (Doc. No. 28) is hereby GRANTED. Summary judgment is granted as to all the plaintiff's claims except his common law claim for invasion of privacy, and that claim is dismissed without prejudice.

    The Clerk shall enter judgment accordingly and close this case.

    It is so ordered.

    Dated this 15th day of September 2011, at Hartford, Connecticut.

                                                   Alvin W. Thompson
                                   United States District Judge