**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-------------------------------x
CARLOS BURGOS,                  :
                                :
          Plaintiff,            :
                                :
v.                              : Civil No. 3:09CV01320(AWT)
                                :
CITY OF NEW BRITAIN,            :
WILLIAM GAGLIARDI, ANTHONY PAVENTI :
AND MATTHEW TUTTLE,             :
                                :
          Defendants.           :
-------------------------------X
```

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Carlos Burgos ("Burgos") brings, pursuant to 42 U.S.C. § 1983, claims against defendants City of New Britain (the "City"), William Gagliardi ("Gagliardi"), Anthony Paventi ("Paventi"), and Matthew Tuttle ("Tuttle"). Burgos brings against the individual defendants a First Amendment retaliation claim, a claim for interference with his right to familial association, and a substantive due process claim; he also brings a Monell claim against the City. In addition, Burgos brings against all defendants a common law claim for invasion of privacy. Burgos alleged a Ninth Amendment claim, which he has withdrawn, and he represents that he has not brought any procedural due process claim. The defendants have moved for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is being granted as to all the plaintiff's federal claims, and the court is declining to

-1-

exercise jurisdiction over the plaintiff's state law claim.

## I.    FACTUAL BACKGROUND

Burgos is a Sergeant in the New Britain Police Department (the "NBPD"). At all relevant times, defendant Gagliardi was Chief of the NBPD, and defendant Paventi was a Lieutenant in the NBPD in charge of training and internal affairs. Defendant Tuttle, who is now deceased,[1] was a Captain in the NBPD assigned to the Detective Bureau.

In May 2008, three female NBPD officers, Jennifer Raspardo, Needasabrina Russell and Gina Spring, made complaints to the NBPD and to the Commission on Human Rights and Opportunities that they were being subjected to a hostile work environment because of their gender. The plaintiff states that he first became aware of these allegations of discrimination on or around May 5, 2008. The plaintiff states that at that time he  made his outrage about the alleged discrimination known to fellow police officers Lieutenant Stanley Masternak and Sergeant Allan Raynis, by expressing support for Officers Raspardo, Russell and Spring. The plaintiff states that on or about November 18, 2008 he made it known to Union President John Gonzalez that he supported Officers Raspardo, Russell and Spring in their claims against the NBPD. Each of Gagliardi, Paventi and Tuttle has averred that he had no

_____

[1]The Plaintiff was granted an extension of time until November 8, 2011 to file a motion to substitute party with respect to defendant Tuttle.

knowledge of any such statements by Burgos.  The plaintiff does
not claim that he informed the individual defendants of his views
and there is no evidence that any of them had any knowledge of
the plaintiff's statements to Masternak or Raynis.

On April 9, 2008, almost a month prior to Burgos becoming
aware of the complaints by Raspardo, Russell and Spring,
defendant Paventi sent a memo to all supervisors informing them
that they were required to attend two mandatory multi-day
training courses.  This memo, sent at the direction of Gagliardi,
stated:

> As each of you are aware, Chief W. Gagliardi
> has placed a strong emphasis on advancing the
> training of all supervisors in our police
> department.  Therefore, over the course of the
> next several months, each of you will be
> contacted by myself and/or Sergeant T. Marino
> to attend upcoming training in various
> supervisory courses.
>
> As of this time, training records indicate
> that you all have received basic training in
> Level-1 Police Supervision.  We are now into
> the next phase of training which will
> encompass more advanced courses for each of
> you in various supervisory programs provided
> by Roger Williams University Justice System
> Training And Research Institute.
>
> The Lieutenants will be selected to a attend
> ten (10) day Mid-Management training course
> and the Sergeants a five (5) day Advanced
> First Line Supervisor Course.
>
> Additionally, each of you will also be
> contacted to attend the five (5) day WMD
> Incident Command Capabilities, Planning and
> Response Actions (WMD/All Hazards) training
> program in Anniston [sic], Alabama.

-3-

> Each of these courses is MANDATORY and will
> require you to travel out of state with the
> understanding that accommodations will be made
> as best as possible to handle any reasonable
> family and/or child care issues that you may
> have.  However, family and/or child care
> issues will not preclude you from your
> obligation to attend these training programs
> as the dates for the courses are minimal and
> fill rather quickly.

(Def.'s Motion for Summary Judgment (Doc. No. 28) ("Def.'s

Motion"), Exh. 5).  The Aniston training and other training was

ordered to help  bring the NBPD into compliance with Governor M.

Jodi Rell's Executive Order No. 10.

On May 16, 2008, the defendant's union, Local 1165, AFSCME,

Council 15, AFL-CIO, filed a municipal prohibited practice

complaint with the State of Connecticut Board of Labor Relations

in response to the April 8, 2008 memo, alleging that the City had

violated the Municipal Employees Relations Act because mandatory

out of state training had not been included in the negotiations

with the union.  This complaint was later withdrawn, in August

2009, "with the understanding that the City will not send any

supervisor police employee to out-of-state training involuntarily

except classes scheduled in Aniston, Alabama and at Roger

Williams University in Rhode Island through the conclusion of the

collective bargaining agreement which expires on June 30, 2010,

and at which time the parties are free to negotiate over any

training outside the State of Connecticut." (Def.'s Motion, Exh.

23).

In a conversation with Paventi on or around August 28, 2008 regarding attendance at the training course in Aniston, Alabama, Burgos was given dates in November and December 2008. At that time, Burgos chose the December 8-12, 2008 session, while reiterating earlier concerns he had expressed about child care and having to travel out of state for training.[2] These concerns were substantially the same as the concerns raised in the complaint that had been filed by his union.

Prior to attending the training course in Aniston, Alabama, all officers were required to fill out a medical information release, which allowed the release by the U.S. Department of Homeland Security ("DHS") of privileged medical information to the officer's private physician or healthcare provider, and a general release of liability in favor of DHS. (Def's Motion, Exh. 12). Burgos objected to signing these forms, but later did so in order to avoid a charge of insubordination. All officers were also required to complete a medical questionnaire,[3] which was to be sent to the DHS, at the time they signed the medical information and liability releases.

On or about December 6, 2008, after he had made several

---

[2] The defendants contend that the plaintiff raised concerns for the first time on November 18, 2008, but the court accepts the plaintiff's version of events for purposes of this motion.

[3] The defendants contend that the plaintiff was not required to fill out the questionnaire, but the court accepts the plaintiff's version of events for purposes of this motion.

attempts to negotiate with the NBPD modifications in the language

of the liability release, Burgos was ordered to sign the medical

information and liability releases without modification.  On

December 8, 2008, Burgos went to Aniston, Alabama for the

training course, but on December 9, 2008 he informed the NBPD

that he had a family medical emergency. Arrangements were made to

have Burgos flown back to New Britain. The plaintiff was paid

five hours of overtime for the 24 hour period he spent in

Aniston.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the

court determines that there is no genuine issue of material fact

to be tried and that the facts as to which there is no such issue

warrant judgment for the moving party as a matter of law.  Fed.

R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317,

322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d

1219, 1223 (2d Cir. 1994).  When ruling on a motion for summary

judgment, the court may not try issues of fact, but must leave

those issues to the jury.  See, e.g., Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of

Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).  Thus, the trial

court's task is "carefully limited to discerning whether there

are any genuine issues of material fact to be tried, not to

deciding them.  Its duty, in short, is confined . . . to issue-

finding; it does not extend to issue-resolution." <u>Gallo</u>, 22 F.3d
at 1224.

Summary judgment is inappropriate only if the issue to be
resolved is <u>both</u> genuine <u>and</u> related to a material fact.
Therefore, the mere existence of <u>some</u> alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment.  An issue is "genuine
. . . if the evidence is such that a reasonable jury could return
a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248
(internal quotation marks omitted).  A material fact is one that
would "affect the outcome of the suit under the governing law."
<u>Anderson</u>, 477 U.S. at 248.  Only those facts that <u>must</u> be decided
in order to resolve a claim or defense will prevent summary
judgment from being granted.  Immaterial or minor facts will not
prevent summary judgment.  <u>See</u> <u>Howard v. Gleason Corp.</u>, 901 F.2d
1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in its favor."  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d
33, 41 (2d Cir. 2000)(quoting <u>Delaware & Hudson Ry. Co. v.
Consolidated Rail Corp.</u>, 902 F.2d 174, 177 (2d Cir. 1990)).
However, the inferences drawn in favor of the nonmovant must be
supported by the evidence.  "[M]ere speculation and conjecture"

is insufficient to defeat a motion for summary judgment.  Stern

v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir.

1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922

F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of

a scintilla of evidence in support of the [nonmovant's] position"

will be insufficient; there must be evidence on which a jury

could "reasonably find" for the nonmovant.  Anderson, 477 U.S. at

252.

## III.  DISCUSSION

The plaintiff claims that when the individual defendants

forced him to sign medical information and liability releases

and to attend a training course in Aniston, Alabama, they

retaliated against him for exercising his right to free speech

under the First Amendment, his right to familial association

under the First and Fourteenth Amendments, and his right to

substantive due process.  He also brings a Monell claim against

the City, and a common law claim for invasion of privacy based on

the medical questionnaire he was required to submit to DHS.

### A.  First Amendment Retaliation Claim

To prevail on a First Amendment retaliation claim, a public

employee must establish that: "(1) his speech addressed a matter

of public concern, (2) he suffered an adverse employment action,

and (3) a causal connection existed between the speech and the

adverse employment action so that it can be said that

[plaintiff's] speech was a motivating factor in the determination." <u>Gallagher v. Town of Fairfield</u>, No. 3:10-cv-1270, 2011 WL 3563160, at *4 (D.Conn., Aug 15, 2011) (quoting <u>Barclay v. Michalsky</u>, 451 F.Supp.2d 386, 394 (D.Conn. 2006); and <u>Mandell v. Cty. of Suffolk</u>, 316 F.3d 368, 382 (2d Cir. 2003)).

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." <u>Sousa v. Roque</u>, 578 F.3d 164, 173 (2d. Cir., 2009) (citing, <u>Connick v. Meyers</u>, 461 U.S. 138, 147-48) (1983)). A matter of public concern is one that "relat[es] to any matter of political, social, or other concern to the community." <u>Id.</u> at 170. "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" <u>Id.</u> at 173 (quoting <u>Ruotolo v. City of New York</u>, 514, F.3d 184, 189 (2d. Cir. 2008).

The plaintiff has produced evidence that would establish the first element of this claim. He is a public employee, and speech addressing gender discrimination in the NBPD is speech addressing a matter of public concern. However, the defendants have met their initial burden with respect to the second and third elements, and the plaintiff has failed to create a genuine issue of material fact as to either.

As to the second element, the Second Circuit has defined an "adverse employment action" as a "materially adverse change in the terms and conditions of employment." <u>Sanders v. N.Y. City</u>

Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).  Such

"materially adverse" changes "include discharge, refusal to hire,

refusal to promote, demotion, reduction in pay and reprimand."

Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).  "In

determining whether conduct amounts to an adverse employment

action, the alleged acts of retaliation need to be considered

both separately and in the aggregate, as even minor acts of

retaliation can be sufficiently 'substantial in gross' as to be

actionable." Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010).

> Thus, ... in order to prove a claim of First
> Amendment retaliation in a situation other
> than the classic examples of discharge,
> refusal to hire, refusal to promote, demotion,
> reduction in pay, and reprimand, plaintiff
> must show that (1) using an objective
> standard; (2) the total circumstances of her
> working environment changed to become
> unreasonably inferior and adverse when
> compared to a typical or normal, not ideal or
> model, workplace.

Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002).  The

plaintiff contends that he was retaliated against when he was

required to attend the training course in Aniston, Alabama.

However, all other supervisors were also required to attend.

Also, being required to sign standard release forms that all

other attendees were also required to sign does not create an

unreasonably inferior work environment.

As to the third element, the plaintiff has failed to create

a genuine issue of material fact as to a causal connection.

Gagliardi's memorandum to all supervisors regarding the training

course was distributed on April 9, 2008, and the plaintiff's

protected speech could not have occurred prior to May 5, 2008, when he first learned of the complaints by Raspardo, Russell, and Spring.

In addition, the plaintiff has not produced any evidence of an awareness on the part of any of the individual defendants that he spoke out. "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) (internal citations omitted). There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009). However, "the direct physical participation of the defendant in the constitutional violation is not alone a sufficient basis for holding the defendant liable if the defendant had no awareness or notice of the facts that rendered the action illegal." Provost v. City of Newburgh, 262 F.3d 146, 154 -155 (2d. Cir. 2001). The plaintiff asserts that his outrage was widely known among his peers, thus resulting in retaliation by the individual defendants. Such a conclusory assertion is insufficient to create a genuine issue of material fact as to causation.

Therefore, the Defendant's motion is being granted as to the

First Amendment retaliation claim.

**B. Familial Association Claims**

"The Supreme Court has recognized a right of association
with two distinct components-an individual's right to associate
with others in intimate relationships and a right to associate
with others for purposes of engaging in activities traditionally
protected by the First Amendment, such as speech and other
expressive conduct." Adler v. Pataki, 185 F.3d 35, 42 (2d Cir.
1999) (citing Roberts v. United States Jaycees, 468 U.S. 609,
617-18 (1984)).  Both the source of the intimate association
right and the standard applied in determining whether that right
has been violated have varied over time.  In Adler, the Second
Circuit explained that the source of the familial association
right can be either the First Amendment or the Fourteenth
Amendment:

> Language in Roberts suggests that this right
> is a component of the personal liberty
> protected by the Due Process Clause. See id.
> at 618-19. However, in City of Dallas v.
> Stanglin, 490 U.S. 19 (1989), the Court cited
> the First Amendment as "embrac[ing]" a right
> of association that included the two elements
> identified in Roberts, intimate association
> and expressive association. See Stanglin, 490
> U.S. at 23-24. In FW/PBS, Inc. v. Dallas, 493
> U.S. 215, 237 (1990), the Court considered a
> claimed violation of the "right to freedom of
> association recognized in Roberts" without
> indicating whether the right was grounded on
> the First Amendment or the Due Process Clause.

Adler, 185 F.3d at 42.  Two standards have been articulated for

assessing whether the right has been violated:

> Sometimes court opinions suggest that an intimate association right is not violated unless the challenged action has the likely effect of ending the protected relationship[.] . . . In other cases, the opinions consider whether the challenged action alleged to burden an intimate association is arbitrary or an " 'undue intrusion' by the state into the marriage relationship." <u>Adkins</u>, 982 F.2d at 956 (quoting <u>Roberts</u>, 468 U.S. at 618, 104 S.Ct. 3244).

<u>Adler</u>, 185 F.3d at 42.  Regardless of which standard applies, the plaintiff has failed to create a genuine issue of material fact.  The plaintiff does not allege that any protected relationship has ended.  With respect to an undue intrusion, the plaintiff's evidence is that he was forced to arrange for child care for a period of up to one week because of his wife's work schedule.  Because he came home early, the plaintiff was actually in Alabama for 24 hours.  Imposing on an employee a requirement that forces the employee to make arrangements for child care for a period of one week or less to accommodate his spouse's work schedule does not constitute an undue intrusion into the employee's familial relationship.

## C.  Substantive Due Process Claim

For conduct to constitute a denial of substantive due process, it must be conduct which "can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience. . . and is so brutal and offensive that it does not comport with

traditional ideas of fair play and decency . . . ." Smith v.

Half Hollow Hill Cent. Sch. Dist., 298 F.3d 168, 173 (2d Cir.

2002) (internal citations and quotation marks omitted).

> Substantive due process is an outer limit on the
> legitimacy of governmental actions.  It does not
> forbid governmental actions that might fairly be
> deemed arbitrary or capricious. . . .  Substantive
> due process standards are violated only by conduct
> that is so outrageously arbitrary as to constitute
> a gross abuse of governmental authority.

Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999).

"Only a substantial infringement of . . . law prompted by

personal animus, or a deliberate flouting of the law that

trammels significant personal or property rights, qualifies for

relief under § 1983." Id.  Conduct that is, "intended to injure

in some way unjustifiable by any government interest is the sort

of official action most likely to rise to the conscience-shocking

level." County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998).

The unconstitutional conduct the plaintiff contends the

defendants engaged in is that they ordered him to attend the

training course in Aniston, Alabama and to submit a medical

information form and releases in connection with that training,

where that training was required of all supervisors as part of an

effort to help the NBPD comply with an executive order of the

Governor and where all other supervisors were required to submit

such a form and such releases.  In withdrawing its complaint, the

plaintiff's union conceded that the City had authority to send

-14-

supervisors to the training course in Aniston, Alabama, merely
reserving the right to make attendance at training programs
outside Connecticut a matter for negotiation with respect to the
next collective bargaining agreement.  Such conduct can not
support a conclusion that there was a substantive due process
violation.

Therefore, the motion for summary judgment is being granted
as to the plaintiff's substantive due process claim.

**D.  Monell Claim**

"In [Monell v. Department of Social Services, 436 U.S. 658
(1978),] the Supreme Court ruled for the first time that
municipalities were liable under § 1983 to be sued as 'persons'
within the meaning of that statute, when the alleged unlawful
action implemented or was executed pursuant to a governmental
policy or custom." Reynolds v. Giuliani, 506 F.3d 183, 190 (2d
Cir. 2007). "A municipality and its supervisory officials may not
be held liable in a § 1983 action for the conduct of a
lower-echelon employee solely on the basis of respondeat
superior. . . . In order to establish the liability of such
defendants in an action under § 1983 for unconstitutional acts by
such employees, a plaintiff must show that the violation of his
constitutional rights resulted from a municipal custom or
policy." Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 122
(2d Cir. 1991) (citation omitted). Thus, "a plaintiff must

demonstrate that, through its deliberate conduct, the

municipality was the 'moving force' behind the alleged injury."

Roe v. City of Waterbury, 542 F.3d 31, 36–37 (2d Cir. 2008)

(citation omitted).

"Where the contention is not that the actions complained of

were taken pursuant to a local policy that was formally adopted

or ratified but rather that they were taken or caused by an

official whose actions represent official policy, the court must

determine whether the official had final policymaking authority

in the particular area involved." Jeffes v. Barnes, 208 F.3d 49,

57 (2d Cir.2000). "The existence of such authority is a question

of law." Id.

Also, the plaintiff must establish a causal link between the

alleged policy or practice and the alleged constitutional

violation. See City of Canton v. Harris, 489 U.S. 378, 385

(1989) ("[The] first inquiry in any case alleging municipal

liability under § 1983 is the question is whether there is a

direct causal link between a municipal policy or custom and the

alleged constitutional deprivation.").

The plaintiff contends that Gagliardi, as Chief of Police

acting in his official capacity, was a decisionmaker responsible

for setting policies and practices for the NBPD, and that Tuttle

and Paventi acted at Gagliardi's direction. However, as discussed

above, here the plaintiff has failed to create a genuine issue of

material fact as to whether any of his federally protected rights was violated.

Therefore, the defendant's motion is being granted as to the plaintiff's the <u>Monell</u> claim.

**E. Invasion of Privacy Claim**

Having granted summary judgment in favor of the defendants on all of the plaintiff's federal law claims, the court declines to exercise supplemental jurisdiction over his state-law claim. Under 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." When federal claims are dismissed before trial, the basis for retaining jurisdiction is weak. <u>See</u> <u>Valencia ex rel. Franco v. Lee</u>, 316 F.3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.") (quoting <u>Carnegie–Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n. 7 (1988)).

**IV. CONCLUSION**

For the reasons set forth above, Defendants City of New Britain, William Gagliardi, Anthony Paventi and Matthew Tuttle's

Motion for Summary Judgment (Doc. No. 28) is hereby GRANTED.

Summary judgment is granted as to all the plaintiff's claims

except his common law claim for invasion of privacy, and that

claim is dismissed without prejudice.

The Clerk shall enter judgment accordingly and close this

case.

It is so ordered.

Dated this 15th day of September 2011, at Hartford,

Connecticut.

                      Alvin W. Thompson
             United States District Judge